# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00677-CR

**Thaung Tin, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-13-904108, HONORABLE CLIFFORD A. BROWN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Thaung Tin of two counts of the offense of sexual assault of a child, two counts of the offense of indecency with a child by contact, and one count of the offense of prohibited sexual conduct.[1] The jury assessed punishment at 14 years' imprisonment for each of the sexual-assault counts and one of the indecency counts and 10 years' imprisonment for the other indecency count and the prohibited-sexual-conduct count, with the sentences to run concurrently. The district court rendered judgment on each verdict. In seven points of error on appeal, Tin asserts that the district court abused its discretion in admitting certain evidence, challenges the sufficiency of the evidence supporting his convictions, and claims that one of his convictions violated double jeopardy. We will affirm the judgments of conviction.

---

[1] *See* Tex. Penal Code §§ 21.11(a)(1), 22.011(a)(2)(C), 25.02(a)(2).

**BACKGROUND**

In an eight-count indictment, Tin was charged with the offenses of sexual assault of a child (counts I and II), indecency with a child by contact (counts III and IV), indecency with a child by exposure (counts V and VI), and prohibited sexual conduct with his stepchild (counts VII and VIII). Prior to trial, the State waived counts V and VI and Tin pleaded not guilty to the remaining counts. The victim alleged in the indictment was B.M., the daughter of Tin's wife, A.M. The jury heard evidence tending to show that Tin, A.M., and B.M. were Burmese refugees who had arrived in Austin in 2009. According to the evidence presented, after the family's arrival in Austin, Tin had, on more than one occasion, touched B.M.'s breasts and contacted her sexual organ with his sexual organ. This evidence included the testimony of B.M., who testified that when she was in the 9th, 10th, and 11th grades, Tin's penis had touched the inside and outside of her vagina. B.M. explained that these incidents would occur at night, when she went to bed. According to B.M., Tin would follow her into her bedroom, get into bed with her, remove his and her pants, and touch her vagina with his penis. B.M. testified that this had occurred "maybe two or three times." Additionally, B.M. also testified that Tin had touched her breasts "many times." The evidence also tended to show that, following one instance of intercourse with Tin, B.M. became pregnant and gave birth to a son who was, according to the evidence presented, Tin's biological child. Based on this and other evidence, which we discuss in more detail below, the jury convicted Tin of the offenses alleged in counts I, II, III, IV, and VII of the indictment and assessed punishment as noted above. The district court rendered judgment on each verdict. This appeal followed.

2

**ANALYSIS**

**Admissibility issues**

In his first and second points of error, Tin asserts that the district court abused its discretion in admitting the testimony of Erica Schmidt-Portnoy, the Area Director of Refugee Services of Texas, who testified to the process of immigrating to the United States as a refugee, and Grace Hser Hti, a Burmese refugee, who testified to Burmese beliefs and attitudes toward sexual relationships between adults and children. According to Tin, the district court should not have allowed either witness to testify because they were neither qualified to testify as experts, nor did they posses sufficient personal knowledge of the matters to which they were opining so as to enable them to testify as lay witnesses.[2]

### Standard of review

We review a district court's evidentiary rulings for abuse of discretion.[3] We are to view the record "in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'"[4]

---

[2] *See* Tex. R. Evid. 602, 701, 702.

[3] *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011).

[4] *Story*, 445 S.W.3d at 732 (quoting *Dixon*, 206 S.W.3d at 590); *see Montgomery v. State*, 810 S.W.2d 372, 391-92 (Tex. Crim. App. 1991) (op. on reh'g).

3

"We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case."[5]

### *Erica Schmidt-Portney*

For the charged offenses of sexual assault of a child and indecency with a child by contact, the State was required to prove that B.M. was younger than 17 years of age at the time the offenses were committed.[6] As part of its efforts to prove this element, the State offered into evidence B.M.'s immigration records, which indicated that B.M.'s date of birth was January 1, 1996. The district court admitted those records into evidence. Later during trial, the State also offered the testimony of Schmidt-Portney. In a hearing outside the presence of the jury, the State explained that Schmidt-Portney would "testify about the processes that take place when a person is in a refugee camp . . . and goes through the process of leaving that refugee camp pursuant to being entitled [to] come to a country." According to the State, the testimony was "important to understand . . . how the dates of birth are acquired in those [immigration] documents that were entered [into evidence]." The State added, "I think it's not something that we all know generally, and I think it would aid the jury in understanding what that process is and how those documents come to be." In response, Tin inquired as to whether Schmidt-Portney was being offered as an expert witness. The district court replied,

---

[5] *Dixon*, 206 S.W.3d at 590 (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)); *see Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010).

[6] *See* Tex. Penal Code §§ 21.11(a), 22.011(c)(1).

4

Well, the person is not going to be received as an expert witness because I don't think they will be giving an opinion, and I see the testimony as relevant testimony that lays some context to the persons in question here, the mother and the daughter, coming to this country and specifically to the issue of fact that is, you know, contested here, and that is the age of the girl, and so I see that as relevant testimony.

Tin next asked whether Schmidt-Portney had any personal knowledge "about this case." The district court responded, "I don't think she's being offered in that regard. She's being offered to explain in context the process by which people come to this country and may gain their immigration status. I see that as relevant to one of the issues of fact of this case." Tin then made the following objection:

Our objection then would be that if she's not an expert we don't believe that she's going to have any personal knowledge of this at all. If she is an expert, we don't think she qualifies as an expert and we have not heard any testimony what the basis is that she's going to testify as an expert, so I would object that there is no basis for her to testify, if that's the case. She's either testifying as an expert or nonexpert. If she's testifying as a nonexpert, she has to have some personal knowledge. That's a requirement of the rules of evidence.

The State argued in response that Schmidt-Portney had "personal knowledge of how the system works, and that's what she's here to testify about. . . . She's going to testify to what her personal knowledge is of how an individual or individuals come from a refugee camp into the United States . . . ." The State added that it believed that Schmidt-Portney would also qualify as an expert "because the expert, according to the rules of evidence, is just somebody who has information that is above and beyond that of a layperson and in a particular area." The district court overruled Tin's objection and explained its ruling as follows:

But just so the record is clear, the Court is not receiving her as an expert and she's not going to give an opinion and she's going to testify with her specialized

5

knowledge in the area of how persons come to this country and gain immigration status and what that process is like, and I believe that is relevant to an issue of fact [in] this case, and so your objection is overruled and you can cross-examine her about these issues.

In response to Tin's request to question Schmidt-Portney outside the presence of the jury on whether she had "any personal knowledge or involvement with this" case, the district court noted, "I think we can stipulate to the fact that she has no personal knowledge, and the record will be clear, if that is true, State, that she has no personal knowledge about this particular immigration request by these persons; is that correct?" The State agreed, and Tin was granted a running objection to the evidence.

Schmidt-Portney began her testimony by discussing her experience and qualifications. Schmidt-Portney testified that for "almost two years," she has overseen the operations of the Austin office of Refugee Services of Texas, which "provide[s] a variety of services to immigrants and refugees." According to Schmidt-Portney, "Refugee resettlement is the domestic side of the process that refugees are offered, so once they have completed the overseas processing, [and] are admitted to the U.S., we provide locally that post-arrival support to ensure people integrate comfortably into society." Schmidt-Portney added that she has "been working in refugee resettlement in various capacities and positions" for six years and has been a licensed social worker for three years. She also testified that she "attend[s] regular trainings and national conferences each year to both maintain my social work license as well as my professional understanding of resettlement as well as the overseas side" of refugee resettlement "so that once [refugees] arrive here, I have that background knowledge."

Schmidt-Portney next proceeded to provide detailed testimony pertaining to the refugee immigration process and the accuracy of immigration records completed during that process. Specifically, Schmidt-Portney testified that when a person first enters a refugee camp, that person provides "very basic information" to people working at the camp, including one's "name, date of birth, [] home country, [and] town." Schmidt-Portney explained that as a refugee works her way through the immigration system—which includes multiple interviews, medical examinations, and "cultural orientations"—the information that the refugee provides during the process is reviewed by various officials working within multiple government agencies, including the Department of Homeland Security, the United States Citizenship and Immigration Services, and the State Department. According to Schmidt-Portney, "the refugee is having to report their name, date of birth to all these different parties" during the immigration process, and this information is "checked multiple times by multiple parties" to ensure that the information is consistent "throughout the process," which Schmidt-Portney testified "can take years" to complete.

Schmidt-Portney further testified that many refugees provide January 1 as their date of birth because they do not know their exact date of birth. According to Schmidt-Portney, "[t]he importance of birthdays is not nearly the same" in "[o]ther cultures and countries" "as it is for us here in the U.S." Therefore, Schmidt-Portney testified, "when people do register in the camp and are going through their interviews, they are being tasked individually to really find the most accurate birthdate that they have," "coming from their memory." Schmidt-Portney added, "The year is often, you know, very accurate, but the actual month and date [are] not."

7

In his first point of error, Tin asserts that the above evidence was inadmissible, re-urging the arguments that he raised in the court below. Specifically, Tin claims that Schmidt-Portney was neither qualified to testify as an expert witness nor permitted to testify as a lay witness due to the fact that she had no personal knowledge of this case.[7]

On this record, it would not have been outside the zone of reasonable disagreement for the district court to find that Schmidt-Portney was permitted to testify as a lay witness. Rule 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue."[8] "Since Rule 701 requires the testimony to be based on the witness's perception, it is necessary that the witness personally observed or experienced the events about which he or she is testifying."[9] "Thus, the witness's testimony can include opinions, beliefs, or inferences as long as they are drawn from his or her own experiences or observations."[10] "This also incorporates the personal knowledge requirement of Rule

---

[7] Tin also asserts, for the first time on appeal, that Schmidt-Portney's testimony was irrelevant. Setting aside the fact that Tin failed to object on this ground in the court below, *see* Tex. R. App. P. 33.1, the district court would not have abused its discretion in finding that Schmidt-Portney's testimony had at least some tendency to make it more or less probable that the victim's birth year, as shown in her immigration records, was accurate, which the district court could have further found was a "fact of consequence in determining the action." *See* Tex. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

[8] Tex. R. Evid. 701.

[9] *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002) (citing *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997)).

[10] *Id*.

602 which states that a witness may not testify to a matter unless he or she has personal knowledge of the matter."[11] Accordingly, "[t]he personal experience and knowledge of a lay witness may establish that he or she is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge."[12]

Here, Tin emphasizes that Schmidt-Portney did not have personal knowledge of the particular facts of this case, a point which the State does not dispute. However, as the district court observed at the hearing, Schmidt-Portney was not "being offered in that regard." Instead, as the State explained, her testimony was offered to explain "how the [refugee] system works" and "how an individual or individuals come from a refugee camp into the United States." Thus, that was the "matter" of which Schmidt-Portney was required to have personal knowledge.[13] And on this record, it would not be outside the zone of reasonable disagreement for the district court to conclude that Schmidt-Portney had "personal experience and knowledge" sufficient to testify on that matter. This personal experience and knowledge, the district court could have reasonably concluded, included the six years that Schmidt-Portney had spent "working in refugee resettlement in various capacities and positions," the "almost two years" that she had spent as the Area Director of Refugee Services of Texas, "oversee[ing] the operations" of the Austin office, and her attendance at "regular trainings and national conferences each year to [] maintain [her] . . . professional understanding of

---

[11] *Id*. (citing *Bigby v. State*, 892 S.W.2d 864, 889 (Tex. Crim. App.1994)); *see* Tex. R. Evid. 602.

[12] *Osbourn*, 92 S.W.3d at 537 (citing *United States v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989)).

[13] *See* Tex. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

resettlement," including the "overseas side" of the process. Nor would the district court have abused its discretion in finding that Schmidt-Portney's testimony would be "helpful . . . to determining a fact in issue," namely, the accuracy of birth dates contained in immigration records. Again, the State was required to prove that B.M. was younger than 17 years of age at the time the offenses were committed, and, as we discuss in more detail below, the State used B.M.'s immigration records to help establish that element. Thus, it would not have been outside the zone of reasonable disagreement for the district court to find that Schmidt-Portney's testimony would be helpful to the jury in determining that fact. Accordingly, on this record, we cannot conclude that the district court abused its discretion in admitting Schmidt-Portney's testimony.[14]

We overrule Tin's first point of error.

### Grace Hser Hti

During the punishment phase of trial, the State offered the testimony of Grace Hser Hti, a Burmese refugee, to testify to "whether or not having sexual relations with your stepfather is something that is acceptable or allowed in her culture or whether or not, for instance, having sexual relationships between a young child and an older individual is acceptable in her culture." Tin objected to the testimony, arguing that Hti was neither qualified to testify as an expert on Burmese laws or culture nor permitted to testify as a lay witness on such matters, due to a lack of personal knowledge. Tin further objected on the basis of relevance. The district court overruled Tin's

---

[14] *See Osbourn*, 92 S.W.3d at 537-38; *see also Austin v. State*, 794 S.W.2d 408, 409-11 (Tex. App.—Austin 1990, pet. ref'd).

objections, and Hti proceeded to testify that it is "not legal," "wrong," and "very shameful" in Burmese society for an adult to have sexual relations with a child. In his second point of error, Tin asserts that the district court abused its discretion in allowing this testimony.

Assuming without deciding that this evidence was inadmissible, the erroneous admission of evidence constitutes non-constitutional error and "must be disregarded" unless the error affected the defendant's "substantial rights."[15] "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict."[16] "[S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'"[17] "In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case."[18] We may also consider the jury instructions, the State's theory and any defensive

---

[15] *See* Tex. R. App. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Tienda v. State*, 479 S.W.3d 863, 880 (Tex. App.—Eastland 2015, no pet.).

[16] *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014) (citing *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

[17] *Motilla*, 78 S.W.3d at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

[18] *Motilla*, 78 S.W.3d at 355 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)).

theories, closing arguments, voir dire, whether the State emphasized the error, and whether there was "overwhelming evidence of guilt."[19]

Here, the record reflects that Hti's testimony was brief. Although the State did discuss Hti's testimony during its closing argument, the State's emphasis was not on Burmese laws and culture but on what was acceptable in the United States legal system and how the laws of this country were designed to protect children such as B.M. from predatory behavior and to punish individuals such as Tin for having sex with children. The State also emphasized the evidence supporting the verdict, which, at the time the jury assessed punishment, could be fairly characterized as overwhelming. In addition to the evidence admitted during the guilt / innocence phase of trial, which we discuss in more detail below, Tin admitted during the punishment phase of trial to having sex with B.M. on multiple occasions, including before the family had immigrated to America when B.M. was younger. In fact, the focus of the parties during the punishment hearing was not on the brief and generalized testimony that Hti provided, but on Tin's detailed and specific testimony pertaining to the circumstances of this case and the history of his relationship with B.M., as well as the testimony of other witnesses who were familiar with Tin's state of mind. On this record, we have "fair assurance that the error," if any, in admitting the evidence "did not influence the jury or had but a slight effect."[20]

We overrule Tin's second point of error.

---

[19] *Id*. at 355-57.

[20] *See id*. at 355.

**Evidentiary sufficiency**

In his third point of error, Tin asserts that the evidence is insufficient to prove that B.M. was younger than 17 years of age at the time the offenses were committed. In his fourth point of error, Tin asserts that the evidence is insufficient to prove that he contacted B.M.'s sexual organ as alleged in count III of the indictment. In his fifth point of error, Tin asserts that the evidence is insufficient to prove that he contacted B.M.'s breasts as alleged in count IV of the indictment. In his sixth point of error, Tin asserts that the evidence is insufficient to prove that B.M. was his stepchild as alleged in count VII of the indictment.

### *Standard of review*

When reviewing the sufficiency of the evidence supporting a conviction, "the standard of review we apply is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[21] "This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts."[22] "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them."[23] "On appeal, reviewing courts 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to

---

[21] *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[22] *Id.*

[23] *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007).

13

the verdict.'"[24]  "Thus, '[a]ppellate courts are not permitted to use a 'divide and conquer' strategy for evaluating sufficiency of the evidence' because that approach does not consider the cumulative force of all the evidence."[25]  "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."[26]  Moreover, "[o]ur review of 'all of the evidence' includes evidence that was properly and improperly admitted."[27]  Finally, "the same standard of review is used for both circumstantial and direct evidence cases."[28]  "Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient" to support a conviction.[29]

### Age of the complainant

In his third point of error, Tin asserts that the evidence is insufficient to prove that B.M. was younger than 17 years of age at the time the offenses were committed, as alleged in counts I, II, III, and IV of the indictment.  According to Tin, "the entirety of the evidence relating to the age

---

[24] *Murray*, 457 S.W.3d at 448 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

[25] *Id*. (quoting *Hacker v. State*, 389 S.W.3d 860, 873 (Tex. Crim. App. 2013)).

[26] *Id*. at 448-49 (citing *Hooper*, 214 S.W.3d at 12).

[27] *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016) (citing *Clayton*, 235 S.W.3d at 778).

[28] *Id*. (citing *Hooper*, 214 S.W.3d at 13).

[29] *Id*. (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

of the complainant at any time stems from various immigration documents" that, in Tin's view, were shown to be inaccurate.

It is true that the immigration documents provided some evidence of B.M's date of birth. However, contrary to Tin's assertions, they did not represent "the entirety of evidence" on that point. Nor is it true that the record contains no evidence from which the jury could have reasonably inferred that the birth year shown in the immigration documents, 1996, was accurate.

B.M. testified that her date of birth was January 1, 1996. When asked how she "knew that," B.M. answered, "It's in [the immigration] documents." The immigration documents were admitted into evidence as State's Exhibit 23. On three separate forms, B.M.'s date of birth was listed as January 1, 1996.[30] Each form included what the jury could have reasonably inferred was B.M.'s signature. Additionally, on two of the forms, the signature appeared below a certification stating that the information provided on the form was "all true and correct" or "true to the best of my knowledge." The "Application for Permanent Residence" also contained the signature of a Burmese interpreter, who certified that she had read the form to B.M. and that B.M. had "understood each and every instruction and question on the form, as well as the answer to each question." Moreover, as discussed above, the jury heard testimony from Erica Schmidt-Portney tending to show that the birth year listed on immigration documents is often "very accurate." Also, Leah Ann Pastrano, an immigration officer with the United States Citizenship and Immigration Services, testified that, although immigrants often guess the month and day of their birth, they attempt to be accurate when

---

[30] The documents were a Form I-485, labeled, "Application to Register Permanent Residence or Adjust Status"; a Form G-325A, labeled, "Biographic Information"; and a Form I-693, labeled, "Report of Medical Examination and Vaccination Record."

providing the year of their birth. Based on this evidence, the jury could have reasonably inferred that, although B.M. might not have been born on January 1, she had been born in 1996.

In addition to the immigration documents, B.M.'s school records were admitted into evidence. The school records, which also indicated throughout that B.M. had been born on January 1, 1996, tended to show that B.M. had attended 8th grade beginning in September 2009 and ending in June 2010, 9th grade beginning in September 2010 and ending in May 2012, and 10th and 11th grades beginning in August 2012 and ending in May 2013.[31] Those dates support the jury's finding that B.M. was approximately 13 years old when she began 8th grade and approximately 17 years old when she completed 11th grade. B.M. testified that Tin's penis had touched the inside of her vagina when she was in the 9th, 10th, and 11th grades.[32] Additionally, B.M. testified that Tin had touched

---

[31] B.M.'s school records, which show that B.M. had attended multiple high schools in the Austin Independent School District, are not a model of clarity. The dates of attendance listed in the records seem to indicate that B.M. had attended 9th grade for two consecutive years at different high schools and had attended 10th grade for the first six months of the 2012-13 school year and 11th grade for the remaining three months. At any rate, the school records reflect that B.M. began 9th grade in August 2010 and completed 11th grade in May 2013.

[32] Tin asserts that the evidence indicates the sexual contact had occurred when B.M. was in the 9th, 10th, *or* 11th grade. To the contrary, the State elicited the following testimony from B.M. on when the contact had occurred:

Q.    In the ninth grade, did [Tin's] penis touch the inside of your vagina?

A.    Yes.

Q.    And in the tenth grade did it touch the inside of your vagina?

A.    Yes.

Q.    And in the eleventh grade did his penis touch the inside of your vagina?

A.    Yes, as well.

16

her breasts "many times," including on the same occasions when Tin was in bed with her, touching her vagina with his penis. From this evidence, the jury could have reasonably inferred that Tin had engaged in sexual contact with B.M. on multiple occasions from 2010 through 2013, beginning when she was either 13 or 14 and ending when she was either 16 or 17 (depending on when in 1996 the jury believed that B.M. had been born).

Finally, the evidence also tended to show that B.M.'s baby had been born on March 4, 2013. According to B.M.'s hospital records, the baby was born at approximately 37 weeks' gestation. Therefore, the jury could have reasonably inferred that the baby had been conceived at some point in June 2012. Other evidence in the record, including B.M.'s testimony and Tin's acknowledgment during a CPS proceeding that he was the father of the child, support a finding that Tin had impregnated B.M. Accordingly, the record supports the jury's finding that at least one of the sexual-assault offenses had definitively occurred in 2012, when, the jury could have reasonably inferred, B.M. was younger than 17 years of age. The record also reflects that approximately three weeks after the baby was born, on March 25, 2013, the police began their criminal investigation into Tin's behavior and that, by April 19, 2013, B.M. was no longer living with Tin and was in the

---

Q. And have you completed the twelfth grade?

A. Yes, I have.

Q. And did his penis touch the inside of your vagina when you were in the twelfth grade?

A. No.

Thus, B.M.'s testimony supports the jury's finding that the sexual contact had occurred when B.M. was in the 9th, 10th, *and* 11th grades.

17

custody of the Texas Department of Family and Protective Services. Thus, the jury could have further inferred that all of the charged offenses had occurred prior to April 2013.

The State concedes that there is some contrary evidence in the record tending to show that B.M. was not younger than 17 years of age at the time the offenses occurred. For example, on cross-examination, B.M. initially testified that Tin had first touched her with his penis when she was 17 years of age, although she immediately thereafter changed her answer, testifying, "Not 17. Probably around 15 into 16." Also, B.M.'s mother testified that she did not know when B.M. was born, and B.M. acknowledged that she "do[es] not know about [her] age," agreeing with defense counsel's characterization of her exact date of birth on her immigration records as "just a guess." Moreover, if B.M. had been born on the exact date of January 1, 1996, as her immigration and school records had indicated, then that would mean that she had turned 17 on January 1, 2013, prior to the birth of her baby and during the time when she was still living with Tin. However, as the State observes, based on the evidence presented, the jury could have found that B.M. had been born on other dates in 1996, including in late 1996, and this would have made her younger than 17 at the time her baby had been born and when she had been removed from Tin's custody. In the end, it was for the jury to resolve these evidentiary conflicts, based on everything in the record—including its evaluation of B.M.'s credibility, appearance, and demeanor—and we are to defer to that resolution in favor of the verdict. On this record, we conclude that the evidence is sufficient to prove that B.M. was younger than 17 years of age at the time the offenses were committed.

We overrule Tin's third point of error.

*Count III of the indictment*

Count III of the indictment alleged that Tin had committed the offense of indecency with a child by contact by touching B.M.'s genitals. In his fourth point of error, Tin asserts that the evidence is insufficient to prove that he committed this offense because, in Tin's view, there was no evidence presented of any hand-to-genital contact, and the only evidence tending to show that Tin had touched B.M.'s genitals with his penis was the same evidence that had formed the basis for Tin's two sexual-assault convictions as alleged in counts I and II of the indictment.

"Sexual contact" is broadly defined in the Penal Code to mean: "(1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person," if that touching was done "with the intent to arouse or gratify the sexual desire of any person."[33] Thus, sexual contact is not limited to touching with one's hands. The State concedes that there was no evidence presented that Tin had contacted B.M.'s genitals with his hands. The State argues instead that there was sufficient evidence presented that Tin had touched B.M.'s genitals with his penis, and we agree that there was. B.M. testified that Tin had touched the inside of her vagina with his penis while he was in bed with her on "maybe two *or three*" occasions and that he had done so when she was in the 9th, 10th, and 11th grades. Viewed in the light most favorable to the verdict, this evidence supports the jury's finding that Tin had contacted B.M.'s vagina with his penis on three separate occasions. Two of those occasions support the jury's findings that Tin had committed the offense of sexual assault of a child

---

[33] Tex. Penal Code § 21.11(c).

19

as alleged in counts I and II of the indictment, and the third occasion supports the jury's finding that Tin had committed the offense of indecency with a child by contact as alleged in count III of the indictment.

We overrule Tin's fourth point of error.

### Count IV of the indictment

Count IV of the indictment alleged that Tin had committed the offense of indecency with a child by contact by touching B.M.'s breasts. In his fifth point of error, Tin asserts that the evidence is insufficient to prove that he committed this offense.

The State elicited the following testimony from B.M. tending to show that Tin had touched her breasts:

Q. Okay. And has anybody ever touched you on your breasts?

A. Yes, my father.

Q. And did he touch you on your breasts over your clothes or under your clothes?

A. With clothes on.

Q. And when he touched your breasts, what part of his body was he using to touch your breasts?

A. Hands.

Q. And why did he touch your breasts with his hands?

A. I did not know.

Q. What else was he doing when he touched your breasts?

20

A. No, nothing else.

Q. Did he say anything to you when he touched your breasts?

A. No, nothing.

Q. What were you doing?

A. When I was cooking and doing the dishes at home and he came by and touched, I was angry.

Later, the State elicited the following additional testimony:

Q. When your dad touched your breasts over your clothes, did that happen one time or more than one time?

A. Many times.

Q. Did it ever happen when you were in the bed with him and his penis was touching your vagina?

A. Yes.

Q. And was that in the apartment on Riverside?

A. Yes, many place[s].

Tin asserts that the above evidence is insufficient to prove that he had touched B.M.'s breasts before she had turned 17 years of age. However, B.M. testified that one of the "many place[s]" in which Tin had touched her breasts was in their apartment on Riverside Drive. Earlier, B.M. had testified that her family had moved into the apartment on Riverside when they had first settled in Austin, which the record reflects was in either 2009 or 2010.[34] B.M.'s mother provided similar testimony.

---

[34] There was conflicting evidence presented as to whether the family had moved into the apartment on Riverside immediately when they settled in Austin, or shortly thereafter. At any rate,

21

Additionally, B.M.'s school records reflect that by the time she was in 11th grade, she lived at a different address on Manor Road. Thus, this evidence supports the jury's finding that Tin had touched B.M.'s breasts at some point during or after 2009 but before 2013. And, as we have already explained, there is sufficient evidence in the record to prove that B.M. was younger than 17 years of age during that time.

We overrule Tin's fifth point of error.

### Count VII of the indictment

Count VII of the indictment alleged that Tin had committed the offense of prohibited sexual conduct by engaging in sexual intercourse with B.M., a person known to be Tin's stepchild. In his sixth point of error, Tin asserts that the evidence is insufficient to prove that B.M. was Tin's stepchild. "Stepchild" is not defined in the Penal Code. However, the court's charge to the jury defined "stepchild" as "the biological or adopted child of one's current spouse from a previous marriage whose parent-child relationship is through marriage only and not by birth or adoption."

The evidence tending to show that B.M. was Tin's stepchild included B.M.'s testimony that her biological father was Nah Reh and that her "other father" was Tin. B.M.'s mother similarly testified that Nah Reh was B.M.'s biological father but that he had died when B.M. was "very little." B.M.'s mother also testified that she had married Nah Reh in Thailand and that she had later married Tin. Additionally, in a related CPS proceeding involving Tin, B.M., and B.M.'s mother, a transcript of which was admitted into evidence, Tin testified that B.M.'s mother was his

_____

it is undisputed that by the time B.M. began 9th grade in 2010, the family lived in that apartment.

wife and that B.M. was his stepdaughter. Viewed in the light most favorable to the verdict, this evidence supports the jury's finding that B.M. was Tin's stepchild as alleged.

We overrule Tin's sixth point of error.


**Double Jeopardy**

In his seventh point of error, Tin asserts that his conviction for the offense of indecency with a child by contact as alleged in count III of the indictment violated the double-jeopardy prohibition against multiple punishments for the same offense because, according to Tin, it arose from the same conduct that resulted in his convictions for the offense of sexual assault of a child as alleged in counts I and II of the indictment. However, as we have already explained above when discussing Tin's fourth point of error, the record supports a finding that Tin had contacted B.M.'s genitals on three separate occasions when she was in 9th grade, 10th grade, and 11th grade. It is well established that there is no double-jeopardy violation when the record establishes that each conviction was supported by evidence of a "separate and distinct act."[35]

We overrule Tin's seventh point of error.

---

[35] *See, e.g.*, *Maldonado v. State*, 461 S.W.3d 144, 149 (Tex. Crim. App. 2015); *Loving v. State*, 401 S.W.3d 642, 646-49 (Tex. Crim. App. 2013); *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999); *Vernon v. State*, 841 S.W.2d 407, 410 (Tex. Crim. App. 1992).

**CONCLUSION**

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Rose, Justices Pemberton and Field

Affirmed

Filed:   April 28, 2017

Do Not Publish